Case No. 17-50282

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

PLANNED PARENTHOOD OF GREATER TEXAS FAMILY PLANNING AND PREVENTATIVE HEALTH SERVICES, INC.; PLANNED PARENTHOOD SAN ANTONIO; PLANNED PARENTHOOD CAMERON COUNTY; PLANNED PARENTHOOD GULF COAST, INC.; PLANNED PARENTHOOD SOUTH TEXAS SURGICAL CENTER; JANE DOE #1; JANE DOE #2; JANE DOE #4; JANE DOE #7; JANE DOE #9; JANE DOE #10; JANE DOE #11,

*Plaintiffs-Appellees*

v.

CHARLES SMITH, in his official capacity as Executive Commissioner of HHSC; and SYLVIA HERNANDEZ KAUFFMAN, in her official capacity as Acting Inspector General of HHSC,

*Defendants-Appellants*

Appeal from the United States District Court, Western District of Texas, Austin Division

No. 1:15-cv-1058

## PLAINTIFFS-APPELLEES' BRIEF

JENNIFER SANDMAN
Planned Parenthood Federation of America, Inc.
123 William Street
New York, NY 10038
(212) 541-7800
jennifer.sandman@ppfa.org

RICHARD MUNIZ
Planned Parenthood Federation of America, Inc.
1110 Vermont Ave NW, Suite 300

Washington, DC 20005
(202) 973-4800
richard.muniz@ppfa.org

THOMAS H. WATKINS
Texas Bar No. 20928000
Husch Blackwell, L.L.P.
111 Congress Avenue, Suite 1400
Austin, Texas 78701
(512) 472-5456
Tom.Watkins@huschblackwell.com
*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Plaintiffs-Appellees | Former or present counsel |
|---|---|
| <ul><li>Planned Parenthood of Greater Texas Family Planning and Preventative Health Services, Inc.</li><li>Planned Parenthood San Antonio</li><li>Planned Parenthood Cameron County</li><li>Planned Parenthood South Texas Surgical Center</li><li>Planned Parenthood Gulf Coast, Inc.</li><li>Jane Does #1, 2, 4, 7, 9, 10, and 11</li></ul> | <ul><li>Jennifer Sandman</li><li>Maithreyi Ratakonda</li><li>Roger Evans</li><li>Alice Clapman</li><li>Richard Muniz</li><li>Thomas H. Watkins</li><li>Helene Krasnoff</li></ul> |
| **Defendants-Appellants** | **Former or present counsel** |
| <ul><li>Charles Smith, in his official capacity as Executive Commissioner of the Texas Health and Human Services Commission</li><li>Sylvia Hernandez Kauffman, in her official capacity as acting Inspector General, Texas Health and Human Services Commission</li></ul> | <ul><li>Ken Paxton</li><li>Jeffrey C. Mateer</li><li>Brantley D. Starr</li><li>Scott A. Keller</li><li>James E. Davis</li><li>Heather Gebelin Hacker</li><li>Angela V. Colmenero</li><li>Andrew B. Stephens</li><li>Amanda J. Cochran-McCall</li><li>Adam A. Biggs</li><li>Marc E. Rietvelt</li><li>Patrick K. Sweeten</li><li>Shelley Dahlberg</li></ul> |

/s/ *Jennifer Sandman*
Jennifer Sandman
*Counsel of Record for Plaintiffs-Appellees*

i

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees respectfully request oral argument, so that the parties may address any questions the Court has about the important issues raised in this matter relating to the federal Medicaid Act.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................................i

STATEMENT REGARDING ORAL ARGUMENT ............................................ ii

TABLE OF CONTENTS........................................................................ iii

TABLE OF AUTHORITIES ................................................................. vi

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................1

STATEMENT OF THE CASE................................................................2

I.   The Provider Plaintiffs' Participation in the Texas Medicaid Program and
     Role in Providing Needed Services ....................................................3

II.  Efforts to Defund Planned Parenthood Organizations, in Texas and
     Nationally ............................................................................6

     A.   HHSC's Attempts to Terminate the Provider Plaintiffs from the
          Medicaid Program...................................................... 9

          1.  First Notice of Termination....................................................9

          2.  The "Investigations" of PPGC ...........................................10

              (a) Texas state investigations...............................................10

              (b) Congressional investigations...........................................12

          3.  The Final Notice of Termination .......................................14

III. Impact of Defendants' Actions on Planned Parenthood Providers and their
     Patients ...........................................................................15

IV.  Other States' Attempts to Exclude Planned Parenthood Providers from
     State Medicaid Programs .................................................17

V.   District Court Proceedings ...........................................................19

A.  The CMP Video and PPGC's Supposed Violation of Medical and Ethical Standards ................................................21

1.  Alteration of (or Willingness to Alter) Abortion Procedures for Research Purposes................................................ 22

2.  Performance of Abortions to Procure Tissue for their Own Research........................................................ 25

3.  Willingness to Profit from Fetal Tissue ..............................26

B.  Claimed Evidence of PPGC Misrepresentation ..........................................27

C.  Claimed Evidence of "Affiliation"............................................28

SUMMARY OF ARGUMENT ..................................................29

ARGUMENT................................................... 31

I.  Standard of Review ...............................................31

II.  The District Court Did Not Abuse its Discretion in Concluding Plaintiffs Likely to Succeed on the Merits .......................................31

A.  The District Court Correctly Held Doe Plaintiffs Have a Private Right of Action that Encompasses the Right to Choose a Provider the State Wrongly Deems Unqualified .................................31

B.  The District Court Properly Held that the Terminations Violates the Doe Plaintiffs' Right to Free Choice of Provider ..................................37

1.  Allegations Against PPGC in HHSC's Final Notice Are Baseless.........................................................38

2.  Defendants' Post-Hoc Justifications for Termination Cannot Succeed ...........................................41

3.  Even if True, Defendants' Allegations Would Not Provide a Valid Basis to Terminate PPGT and PPST ................................43

4.  Arbitrary and Capricious Review Does Not Apply and, If It Does Apply, Is Met .....................................46

iv

5.   Defendant's Pennhurst Argument is Unavailing ............................. 51

IV. The District Court Did Not Clearly Err In Finding the Other Preliminary Injunction Requirements Are Met .................................................... 52

A.   The District Court's Finding that Doe Plaintiffs Would Be Irreparably Harmed Without an Injunction Is Not Clearly Erroneous ..................... 52

B.   The District Court's Findings that the Balance of Equities and Public Interest Both Favor Plaintiffs Are Not Clearly Erroneous ..................... 53

V.   The District Court Did Not Commit Err in Preliminarily Enjoining Defendants  From Terminating Provider Plaintiffs' Medicaid Provider Agreements ................................................................................................ 53

CONCLUSION .................................................................................................. 54

CERTIFICATE OF SERVICE ........................................................................... 57

CERTIFICATE OF COMPLIANCE .................................................................. 58

# TABLE OF AUTHORITIES

**Cases**

*Abbeville Gen. Hosp. v. Ramsey*, 3 F.3d 797, 802 (5th Cir. 1993)............. 48, 49, 50

*Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 643 (1986) ...........................................50

*Brumfield v. Cain*, 808 F.3d 1041(5th Cir. 2015)...................................................31

*Byrum v. Landreth*, 566 F.3d 442 (5th Cir. 2009) ..................................................31

*Castorena v. Zamora*, 684 F. App'x 360 (5th Cir. 2017)  .......................................44

*Doe v. Columbia-Brazoria Indep. Sch. Dist. by & through Bd. of Trustees*, 855
    F.3d 681 (5th Cir. 2017)  ....................................................................................44

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ..................................................................41

*Hernandez v. Reno*, 91 F.3d 776 (5th Cir. 1996)....................................................55

*Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011) ....................................................31

*La. Envtl. Action Network v. EPA*, 382 F.3d 575 (5th Cir. 2004) ...........................50

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989)............................................50

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .............................................................41

*O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773 (1980)......................... 32, 34

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981)...........................51

*Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960
    (9th Cir. 2013) ................................................................... 17, 32, 46, 54

*Planned Parenthood of Gulf Coast, Inc. v. Gee,* 862 F.3d 445 (2017) ........... passim

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*,
    699 F.3d 962 (7th Cir. 2012) ..................................................... 17, 32, 54

*Planned Parenthood of Kan. & Mid.-Mo., Inc. v. Mosier,* 2016 WL 359457,
  No. 16-2284-JAR-GLR (D. Kan. July 5, 2016) ............................................ 18, 54

*Planned Parenthood Se., Inc. v. Bentley,* 141 F. Supp. 3d 1207 (M.D. Ala.
  Oct. 28, 2015) ................................................................. 17, 35, 45, 54

*Planned Parenthood Se., Inc. v. Dzielak*, No. 3:16CV454-DPJ-FKB, 2016 WL
  6127980 (S.D. Miss. Oct. 20, 2016)....................................................54

*Planned Parenthood Ark. & E. Okla. v. Gillepsie*, 867 F.3d 1034
  (8th Cir 2017).................................................................18

*Town Court Nursing Ctr. v. Beal*, 586 F.d 280 (3d Cir. 1978)...............................35

*Texas v. EPA*, 690 F.3d 670, 678 (5th Cir. 2012)....................................48

*United States v. Herrera-Ochoa*, 245 F.3d 495 (5th Cir. 2001)................................8

## Statutes

42 U.S.C. § 1320a-7(b)(6)(B) .......................................................44

42 U.S.C. § 1396a(p)(1)...........................................................44

42 U.S.C. § 1983 ............................................................ 18, 31

42 U.S.C. § 289g-1...........................................................14, 40

42 U.S.C. § 1320a-7..............................................................41

42 U.S.C. §1320a-7(b)(8) ........................................................45

42 U.S.C. § 1396a(a)(23) ................................................ 17, 29, 35, 51

42 U.S.C. § 289g-1(b)(2)(c)(i)........................................................25

42 U.S.C. § 289g-1(c)(4) ...................................................... 25, 40

La. Stat. Ann. § 37:1270 .......................................................36

Tex. Penal Code §37.08(a) ........................................................................28

**Rules**

Fed. R. Evid. 201(d)...................................................................................8

**Regulations**

1 Tex. Admin. Code § 1320a-7(b)(6)(B) ..................................................49

1 Tex. Admin Code § 371.1703(f)............................................................41

1 Tex. Admin. Code § 371.1605(a)(2)......................................................45

1 Tex. Admin. Code § 371.1703(e) ..........................................................41

1 Tex. Admin. Code § 371.1703(c)(7)......................................................45

25 Tex. Admin. Code § 139.1………………………………………….36

42 C.F.R. §1001.1001(a)...........................................................................45

45 C.F.R. §46.204(i) ........................................................................ 25, 40

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Did the district court correctly hold the Doe Plaintiffs have a private right of action under §1396a(a)(23) to challenge Provider Plaintiffs' termination from Texas's Medicaid program, as established under *Planned Parenthood of Gulf Coast, Inc. v. Gee,* 862 F.3d 445 (2017)?

2.     Did the district court commit clear error in determining, after a three-day evidentiary hearing, that the claimed bases for termination were unsupported by the evidence and the terminations likely violated the Doe Plaintiffs' right to the qualified Medicaid provider of their choice, as well as that the other preliminary injunction factors were satisfied, and entering a preliminary injunction on that basis?

3.     Did the district court commit clear error in issuing an injunction preventing termination of the Provider Plaintiffs' Medicaid agreements, rather than limiting its relief to certain patients or health centers?

## STATEMENT OF THE CASE

This appeal concerns an order preliminarily enjoining Defendants Charles Smith, Executive Commissioner of Texas Health and Human Services Commission ("HHSC") and Sylvia Hernandez Kauffman, Acting Inspector General, HHSC Office of Inspector General ("OIG"), from terminating the Medicaid provider agreements of Plaintiffs Planned Parenthood Greater Texas, Inc. ("PPGT"), Planned Parenthood Gulf Coast, Inc. ("PPGC"), and Planned Parenthood South Texas and its subsidiaries Planned Parenthood San Antonio, Planned Parenthood Cameron County, and Planned Parenthood South Texas Surgical Center (together, "PPST") ("Provider Plaintiffs").  The enjoined terminations were the culmination of a concerted effort over more than a decade to come between Provider Plaintiffs and the low-income patients they serve, and were based solely on videos made by a radical anti-abortion group with ties to violent extremists—videos that have been widely debunked and are wholly irrelevant to two of the three Provider Plaintiffs.

The preliminary injunction order ensures that the patient Plaintiffs Jane Does 1, 2, 4, 7, and 9–11 ("Doe Plaintiffs") and Provider Plaintiffs' other nearly 11,000 Texas Medicaid patients can continue to obtain critically needed high quality family planning and other preventive health services from Provider Plaintiffs through the Medicaid program while Plaintiffs' challenge to Defendants' meritless termination proceeds. This relief was warranted because, as the district court properly found,

Plaintiffs are likely to succeed on their claim that the termination violates the Doe Plaintiffs' rights under the Free-Choice-of-Provider requirement of federal Medicaid law, which protects a Medicaid patient's right to receive care from any qualified provider of her choosing.  Indeed, the district court found after a three-day evidentiary hearing that there was not "even a scintilla of evidence" to support the Provider Plaintiffs' termination, ROA.3813, and supported that conclusion with detailed factual findings—which Defendants ask this Court to disregard entirely.

They also ask this Court to disregard its recent opinion in *Planned Parenthood Gulf Coast v. Gee*, 862 F.3d 445 (5th Cir. 2017), preventing Louisiana's attempt to terminate one of the same Provider Plaintiffs, PPGC, from the Louisiana Medicaid program based on the same video.  But for the same reasons as in *Gee*, Plaintiffs' claims are properly before this Court, they are likely to prevail on the merits, and the preliminary injunction should be affirmed.

## I.    The Provider Plaintiffs' Participation in the Texas Medicaid Program and Role in Providing Needed Services

The Provider Plaintiffs provide Medicaid services across the state of Texas at thirty health centers, and have done so for decades.  ROA.3779, 3589–90.  In 2015, Provider Plaintiffs served nearly 11,000 patients enrolled in Medicaid.  Plaintiffs offer a range of family planning and other health services, including physical exams, contraception, screening for breast cancer, screening and treatment for cervical cancer, testing for sexually transmitted infections ("STIs"), and biopsies and

3

colposcopies.  ROA.3779.  Texas Medicaid does not pay for abortions except in extremely narrow circumstances (specifically, if their lives are in danger or for victims of rape or incest).  ROA.3784, 4914.

Texas has some of the most stringent Medicaid requirements in the country: in addition to having a low income, an individual must also meet a special characteristic, such as having dependent children or a disability, to be eligible.  For example, a single woman with a dependent qualifies for Medicaid only if she has a monthly income of $152 or less.  ROA.4523–24.

As the district court found, Provider Plaintiffs are the only family planning specialists in the Texas Medicaid program.  ROA.3779.  Patients also choose the Provider Plaintiffs because they are known and trusted for non-judgmental care related to reproductive health issues.  ROA.4914, 4963, 4993, 5017.  Patients may forgo family planning care altogether if they do not find a provider that makes them comfortable.  ROA.4914, 5009, 5017.

As the district court found, the Provider Plaintiffs have designed their services around the reality that low-income patients often have little time to devote to their own health care and face competing childcare and work obligations, limited transportation resources, and inflexible and/or unpredictable work schedules. ROA.3779, 4915, 4963, 4991, 4996, 5017. To maximize access to family planning services, the Provider Plaintiffs offer evening and Saturday hours; next-day or walk-

in appointments, flexible scheduling, short wait-times, and same-day services for long-acting contraception, so patients only need to make one trip to the health center. ROA.3779, 4915, 4963, 4991. They also offer bilingual services and health centers located in medically underserved areas. ROA.4915, 4926–27, 4962–3, 4991–93.

As the district court correctly found and the uncontroverted evidence shows, Provider Plaintiffs are wholly separate organizations from each other, each with its own board, CEO, and management structure and control of its own finances and operations; and with no overlap whatsoever in ownership or control. ROA.3780, 4921, 4952, 4988–89. Each maintains its own protocols, procedures, and policies. ROA.4922, 4990, 4112. The only legal relationship they have in common that each is a member of Planned Parenthood Federation of America ("PPFA"), a membership organization that promulgates medical and other standards to which members (known as "affiliates") must adhere in order to operate under the name "Planned Parenthood" and otherwise use the Planned Parenthood mark. ROA.3780, 4920–21, 4952, 4989. Provider Plaintiffs are not affiliates, subsidiaries, parents, employees, contractors, vendors, or agents of one another. ROA.4920–21, 4989.

And as the district court correctly found and the uncontroverted evidence shows, neither PPGT and PPST, nor their related entities, participate in, or have ever participated in, placental or fetal tissue donation. ROA.3788; *see also* ROA.4914, 4985, 4111. No PPGT or PPST staff members appear in the video that is the basis

for the allegations of misconduct in the Final Notice of Termination.  ROA.4919–20, 4988.

## II.   Efforts to Defund Planned Parenthood Organizations, in Texas and Nationally

Despite the Provider Plaintiffs' high quality care, Texas has long sought to terminate them from publicly-funded health programs, regardless of the cost to patients or even to the state budget. Starting in 2003, the Texas legislature enacted several funding restrictions aimed at preventing providers associated with abortion from participating in publicly-funded family planning programs. ROA.4915.

As Attorney General, now-Governor Greg Abbott issued the interpretations HHSC relied on in its 2012 rule excluding all Planned Parenthood organizations from the Women's Health Program ("WHP"), which was 90% federally funded and at one point enrolled over 150,000 Texas women, 45% of whom were served by Planned Parenthood. ROA.4915–16. Texas was so determined to defund the Planned Parenthood Plaintiffs that it did so in violation of federal law, causing the state to forgo over $30 million yearly in federal family planning funds since 2013, and requiring the state-funded program to end entirely if Planned Parenthood could participate.  ROA.4916.  Instead of viewing the massive loss of federal WHP funds as a public health crisis, Governor Abbott celebrated the state's role in "ensuring that Planned Parenthood is closing down clinics across the state of Texas." ROA.4016–17.

Until recently, Medicaid was the only public health program from which Texas had not excluded the Planned Parenthood Providers. Then, starting in July 2015, a radical anti-abortion group, the Center for Medical Progress ("CMP"), released a series of videos on YouTube, including one taken at PPGC headquarters at a meeting with PPGC's Research Director. CMP, which opposes abortion and has ties to violent extremists, obtained this footage under false pretenses by masquerading as a biotechnology company. ROA.3788, 4949, 5526. CMP repeatedly baited Planned Parenthood staff and spliced together heavily edited footage to try to create an appearance of wrongdoing in connection with some affiliates' facilitation of tissue donation for research purposes. ROA.4949, 5528–29.

As discussed in greater detail below in Statement of the Case V(A), and as correctly found by the district court, CMP's videos do not show any violations of law or other applicable standards by Planned Parenthood organizations. To the contrary, leading medical organizations, including the American Congress of Obstetricians and Gynecologists, the American Public Health Association, and the New England Journal of Medicine, have called the CMP-created videos what they are—baseless attacks—and continue to strongly support Planned Parenthood organizations as providing high-quality, essential health services to millions of underserved patients annually. *See* George P. Topulous, M.D. et al., *Editorial,*

7

*Planned Parenthood at Risk*, 373 N. Eng. J. Med. 963 (Sept. 3, 2015); Letter from Am. C. Nurse-Midwives to Hon. Mitch McConnell, Majority Leader, and Hon. John Boehner, Speaker, (Aug. 3, 2015), http://www.midwife.org/acnm/files/ccLibraryFiles/Filename/000000005551/Provi derLetteronPlannedParenthood.pdf.[1] Following release of the videos, officials in thirteen states–including Texas–launched investigations and all of them fully vindicated Planned Parenthood.  Eight others declared the evidence insufficient to waste government resources on an investigation.[2]

State government officials whom also oppose safe and legal abortion nonetheless pounced on the videos as an excuse to exclude Planned Parenthood from participation in public health programs.  This movement, which started in Arkansas, Utah, Alabama, and Louisiana, reached Texas in October, 2016.[3]

---

[1] This Court may take judicial notice of these and facts from similar sources elsewhere in the brief. *United States v. Herrera-Ochoa*, 245 F.3d 495, 501 (5th Cir. 2001); Fed. R. Evid. 201(d).

[2] *See* Laura Bassett, A Year After "Baby Parts" Videos, *Planned Parenthood is Taking its Victory Lap*, Huffington Post (July 18, 2016), http://www.huffingtonpost.com/entry/planned-parenthood-baby-parts-legacy_us_5787a724e4b03fc3ee4f7fed.

[3] Following Texas, there have been similar efforts in Kansas, Mississippi, Ohio, and Florida.

A.   **HHSC's Attempts to Terminate the Provider Plaintiffs from the Medicaid Program**

1.   **First Notice of Termination**

On October 19, 2015, without warning, HHSC sent a letter titled "Notice of Termination" to each Provider Plaintiff, effective fifteen days after receipt of a final notice of termination.  ROA.1202–07, 1239–43, 1310–14.[4]  Each stated: "The State has determined that you . . . are no longer capable of performing medical services in a professionally competent, safe, and legal manner," and "[i]f you fail to respond to this Notice of Termination within 30 calendar days of receipt, then we will issue a Final Notice of Termination." *Id*.  While sent to all of the Provider Plaintiffs, those Notices focus entirely on (false) allegations against PPGC and Planned Parenthood's national office, PPFA.  The Notices claimed four bases for termination (though the State subsequently abandoned three of the four), none of which were sustainable grounds for terminating PPGC—much less PPST and PPGT.

On November 23, 2015, Plaintiffs filed this litigation and moved for a preliminary injunction to ensure Medicaid patients, including Doe Plaintiffs, could continue receiving services at the Provider Plaintiffs.  ROA.31.  Perhaps aware the terminations lacked any plausible basis, HHSC reversed course and took the position it had not yet determined whether it would terminate Provider Plaintiffs from

---

[4] For ease of reference, because each notice is identical in substance they will be cited in only one location hereinafter.

Medicaid.  Given HHSC's inaction, the Court dismissed the pending preliminary injunction motion.  ROA.3791–92, 3812–13, 8943–44 (sealed).

HHSC did not, however, rescind its termination letters; rather, the State promised further investigations in order to reach its stated goal of ensuring no Medicaid funds go to Planned Parenthood. *See LIFE Initiative*, Abbott–Governor, https://www.gregabbott.com/life-initiative/ (Dec. 29, 2016) ("As Planned Parenthood is investigated, Governor Greg Abbott has announced the "LIFE Initiative" to protect the unborn and prevent the sale of baby body parts ... Funding for Planned Parenthood [will be] COMPLETELY ELIMINATED.") (emphasis in original); Statement by Att'y Gen. Paxton, (Jan. 25, 2016), http://ow.ly/X1op307y8jJ ("The state's investigation of Planned Parenthood is ongoing.").

### 2. The "Investigations" of PPGC
#### (a) Texas state investigations

The day after the CMP video concerning PPGC[5] came out, the Lieutenant Governor directed the Harris County District Attorney to initiate a criminal investigation. *Governor Dan Patrick Asks Harris County D.A. To Immediately Open Criminal Investigation of Planned Parenthood in Texas,* Lieutenant Governor of

---

[5] While PPGC does not provide abortions, the related entity Planned Parenthood Center For Choice, Inc. does.  The district court referred to both entities as PPGC. ROA.3780.  To avoid confusion, Plaintiffs will do the same.

Texas—Dan Patrick, (Aug. 5, 2015), http://ow.ly/KwWY307y8tt. The District Attorney conducted a thorough joint investigation together with the Texas Rangers and Houston Police Department; this investigation (with which PPGC cooperated in full) included hours of interviews with PPGC staff, a two-hour tour of the facility where the video was taken, production and review of over 800 pages of documents, and review of what PPGC believes was the unedited version of the CMP video. ROA.4955. On January 26, 2016, the District Attorney announced: "For more than two months, the 232nd Grand Jury extensively reviewed the joint investigation into allegations of misconduct by PPGC [and] cleared PPGC of breaking the law." Harris County DA Press Release, Jan 25, 2016. Instead, the grand jury indicted the anti-abortion extremists who created the videos. *Id.*[6]

Nor was this the only Texas investigation. The Attorney General's office, DSHS, and HHSC all conducted separate, overlapping investigations, with which PPGC and the other Provider Plaintiffs cooperated fully, making employees available to speak with Attorney General and DHSS officials during health center inspections and producing or making available for inspection thousands of pages of

---

[6] While those charges were eventually dismissed on technical legal grounds, the two extremists subsequently were indicted again. ROA.4956 n.1; Press Release, State of Cali. Dep't of Just., Attorney General Announces Charges Filed Against David Robert Daleiden for Criminal Invasion of Privacy (Mar. 28, 2017), https://oag.ca.gov/news/press-releases/attorney-general-xavier-becerra-announces-charges-filed-against-david-robert .

documents on topics including fetal tissue donation, fetal tissue disposal, Medicaid billing, and communications with the fictitious biotechnology company. ROA.4918, 4956–57, 4986–87. These investigations started immediately after the release of the first CMP video and continued even after HHSC issued the October 2015 Notices of Termination. ROA.4917, 4956, 4986–87.

As the district court correctly found, despite these "extensive investigations," ROA.3777, "aside from HHSC's allegations with respect to the Texas Medicaid program, the record includes no additional findings of wrongdoing from the investigations and no efforts to revoke any license or qualification of the Provider Plaintiffs." ROA.3789.

### (b)     Congressional investigations

Four Congressional Committees also launched investigations and requested a broad range of information from PPFA and Planned Parenthood affiliates, including Provider Plaintiffs. In response, PPFA and Planned Parenthood affiliates voluntarily produced over 25,000 pages of documents and made staff from across the country available for interviews with Congressional staff. PPFA's CEO testified for almost five hours in front of the House Oversight and Government Reform Committee. Letter from Democratic Members, Select Investigative Panel ("Select Panel") to Blackburn (Jan. 21, 2016), https://schakowsky.house.gov/uploads/2016-01-21%20SP%20Dems%20Letter%20to%20Chair.pdf. After review of these extensive

submissions, Jason Chaffetz, the chair of the House Oversight and Government Reform Committee admitted: "Was there any wrongdoing? I didn't find any."[7] These Committees found no wrongdoing by the Provider Plaintiffs.[8]

In October 2015, while Planned Parenthood organizations were still turning over documents to Congress, the House of Representatives formed and tasked yet another committee, which according to its website is known informally as the "Select Panel on Infant Lives" ("Select Panel"), with investigating Planned Parenthood and its tissue donation practices. Planned Parenthood again fully cooperated, and on December 1, 2016 the chair, Representative Marsha Blackburn, wrote a letter asking the Texas Attorney General to further investigate whether PPGC violated Texas law in connection with its facilitation of the donation of fetal tissue.[9] *See* ROA.9022–9032. That letter did not itself find any wrongdoing and in fact, raised issues that mirror those the Harris County District Attorney had already

---

[7] Jennifer Bendery, *GOP Probe Into Planned Parenthood Funding Comes Up Empty*, The Huffington Post (Oct. 12, 2015), http://www.huffingtonpost.com/entry/jason-chaffetz-planned-parenthood-funding_us_5616ed01e4b0dbb8000de134.

[8] While Representative Charles Grassley, the chair of the Senate Judiciary Committee, wrote a letter suggesting further investigation of four Planned Parenthood affiliates, the Provider Plaintiffs were not among them. ROA.4958.

[9] While the Final Notice describes the Blackburn Letter as the "bipartisan" Select Panel "refer[ing] its evidence" to the Attorney General, ROA.4715 n.1, as the district court recognized the letter is only from Representative Blackburn, ROA.3813 n.12, a strong opponent of abortion who has consistently voted against embryonic stem cell research. *See* On The Issues, Marsha Blackburn on Abortion, available at http://www.ontheissues.org/House/Marsha_Blackburn.htm#Abortion.

investigated. ROA.9022–32, 4988–89. Despite Appellants' citation to this letter, in fact, as the district court found, the Inspector General admitted he did not conduct any investigation after reviewing the letter. ROA.3808.

### 3.     The Final Notice of Termination

Fourteen months after its initial notice, on December 20, 2016, HHSC issued a Final Notice of Termination ("Final Notice") to each provider. ROA.4714–19.

As noted above, HHSC abandoned three of its four prior bases for termination,[10] and the Final Notice staked its claim on the theory the CMP video shows PPGC "follows a policy of agreeing to procure fetal tissue, potentially for valuable consideration, even if it means altering the timing or method of an abortion," and that "these practices violate accepted standards, as reflected in federal and state law, and are Medicaid program violations that justify termination." [11] ROA.4715. The Final Notice also asserted that evidence provided by the Select

---

[10] Two of those abandoned bases related to supposed infection control issues seen in the CMP video. ROA.1203. The third was based on two qui tam False Claims Act cases, one then pending and the other settled with no admission of liability and *with an express agreement* by the State the settlement was not a basis for termination from Medicaid. ROA.1204, ROA.1245–64; *see also Gee*, 862 F3d at 466 (state "cannot show that PPGC's settlement of qui tam FCA claims, in which it disclaimed all liability, constitutes actual fraud or renders PPGC unqualified in some other way").

[11] The federal law Defendants cite is limited to HHS-funded research on "the transplantation of human fetal tissue for therapeutic purposes," 42 U.S.C. § 289g-1, and does not apply to research PPGC has participated in, which has nothing to do with such transplantation. ROA.5050–31.

Panel reflects that PPGC engaged in an unspecified "misrepresentation" about activity related to fetal tissue procurement. ROA.4716.

While the Final Notice sets forth the same bases for termination as to each of the Provider Plaintiffs, its accusations relate *only* to PPGC.  ROA.4715.  PPGT and PPST were terminated because they were claimed to be "affiliated with a provider that commits a program violation subjecting it to …termination."  ROA.4716.

## III.   Impact of Defendants' Actions on Planned Parenthood Providers and their Patients

Provider Plaintiffs' exclusion from Medicaid would have devastating consequences for them and the nearly 11,000 Texas Medicaid patients who receive care at Planned Parenthood health centers each year, including the Doe Plaintiffs. ROA.3779.  Patients at Planned Parenthood's thirty health centers across the state will see their care disrupted and lose their chosen provider.  As noted above, patients choose Planned Parenthood Providers for various reasons; they trust them to provide high-quality, respectful care and can access their services more easily.  Many patients will face difficulties finding other providers who will see them, especially if they have a condition requiring urgent care.

In part because of low reimbursement rates and onerous reimbursement policies, Texas suffers from a shortage of willing Medicaid providers.  ROA.4923. Many Medicaid providers are already stretched thin; some take Medicaid patients only if they are pregnant, and others have long wait times (even for patients with

urgent symptoms).  ROA.4926, 4961–62, 4991–92.  Moreover, as noted above, many of the Provider Plaintiffs' health centers are located in medically underserved areas where their loss would be particularly harmful.  ROA.4926–27, 4962, 4992–93.

The record shows many Texas Medicaid providers offer more limited services than Provider Plaintiffs; for example, they do not offer long-acting reversible contraceptives, which are the most effective forms of birth control, or lifesaving cancer screening procedures.  ROA.4926, 4301.  Indeed, other Medicaid providers often refer patients to Provider Plaintiffs for those services.  ROA.4926.  And as Defendants' witnesses conceded, many Medicaid providers (unlike the Planned Parenthood Providers) do not offer patients extended hours or weekend hours, or same-day or walk-in appointments—yet Defendants' witnesses also conceded access to such hours is important for Medicaid patients.  ROA.4525–27, 4530, 4459–60, 4523.

If Provider Plaintiffs are forced to stop providing care in the Medicaid program, this situation will worsen. Women and men who are unable to obtain family planning care, or encounter delays in obtaining it, can face devastating consequences, including unintended pregnancies, STIs, and undiagnosed cancers. ROA.4992–93, 4927, 4963. Provider Plaintiffs, for their part, will lose substantial reimbursements, forcing them to reduce services and hours and potentially close

clinics. ROA. 4927, 4964, 4984, 4933–34, 4133–34, 4302. They will also be prevented from fulfilling their mission to protect the health and well-being of underserved patients. ROA.4927, 4964, 4994.

## IV.  Other States' Attempts to Exclude Planned Parenthood Providers from State Medicaid Programs

Texas is not the only state to try to exclude Planned Parenthood affiliates from Medicaid. Both Indiana and Arizona tried prior to the CMP videos, but those efforts were rejected, with both the Seventh and Ninth Circuits holding that preventing Medicaid enrollees from obtaining care from their qualified provider of their choice violates 42 U.S.C. 1396a(a)(23), the "Free-Choice-of-Provider" requirement, which provides that state Medicaid plans "must provide" that "any individual eligible for medical assistance…may obtain such assistance from any…agency…or person, qualified to perform the service or services required…who undertakes to provide such services." *See Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 2736 (2013); *Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 1283 (2014).

Following the release of the videos, Alabama, Arkansas, and Kansas have tried to terminate Planned Parenthood affiliates from Medicaid but federal court injunctions have blocked those efforts. *See Planned Parenthood Se., Inc. v. Bentley,* 141 F. Supp. 3d 1207 (M.D. Ala. Oct. 28, 2015), Order, *Planned Parenthood Se. v.*

*Bentley,* No. 2:15cv00620-MHT (M.D. Ala. Nov. 30, 2015); *Planned Parenthood of Kan. & Mid.-Mo., Inc. v. Mosier,* 2016 WL 359457, No. 16-2284-JAR-GLR (D. Kan. July 5, 2016), *appeal docketed* No. 16-3249 (Aug. 3, 2016); *but see Planned Parenthood Ark. & E. Okla. v. Gillepsie*, 867 F.3d 1034 (8th Cir 2017) (petition for en banc review pending).

Most notably, in a case on all fours with this one, this Court rejected Louisiana's attempt to terminate one of the *same* Provider Plaintiffs in this case, PPGC, based on claimed violations arising from the *same* CMP video at issue here. *Planned Parenthood of Gulf Coast, Inc. v. Gee,* 862 F.3d 445 (5th Cir. 2017). This case authoritatively held the Free-Choice-of-Provider requirement affords a private right of action enforceable under §1983, and that this right limits states to excluding a willing provider from Medicaid only for reasons bearing on its ability "to … perform[] the needed medical services in a professionally competent, safe, legal, and ethical manner." *Id.* at 457, 465. In rejecting Louisiana's bases for termination (relating to two pending qui tam FCA claims, a supposed misrepresentation made in the course of responding to inquiries about fetal tissue donation in response to the CMP video, and two pending investigations in response to the video), this court noted such "accusation[s]," "devoid of any factual support or linkage," cannot support a termination from the Medicaid program and cannot "insulate the [State's] actions from a §1396a(a)(23) challenge." *Id.* at 469–70. Indeed, "[i]f it were

18

otherwise, states could terminate Medicaid providers with impunity and avoid §1396a(a)(23)'s mandate altogether." *Id*.

## V.     District Court Proceedings

After Defendants issued the Final Notice of Termination, Plaintiffs moved again for preliminary injunctive relief.  The district court conducted a three-day evidentiary hearing, at which it viewed extensive footage from the CMP video taken at PPGC[12] and heard detailed testimony from witnesses including PPGC's Director of Research (who was heavily featured in the video and upon whose taped conversation the termination was almost exclusively based); medical and ethics experts on both sides, including PPGC's Medical Director and the State's Chief Medical Officer; the CEOs of each terminated affiliate; and the then-Inspector General of OIG, who was responsible for the termination decision, among others. The court also considered declaration testimony of multiple witnesses including the Doe Plaintiffs.  At the conclusion of the evidentiary hearing the district court entered a temporary restraining order, ROA.3551–52, and on February 21, 2017 issued a detailed 42-page order granting a preliminary injunction.

Focusing on likelihood of success, the district court first held it was bound by *Gee*'s "unqualified statement" that Medicaid beneficiary plaintiffs have a private

---

[12] The district court also reviewed the video footage in its entirety in chambers. ROA.3801.

right of action to enforce the Free-Choice-of-Provider requirement, ROA.3796, and that under *Gee* a provider is "qualified," and thus cannot be terminated from the Medicaid program, if the provider is "capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner." ROA.3797 (quoting *Gee*, 862 F.3d at 457) (internal quotation marks and citations omitted).[13]

The court then turned to Defendants' asserted bases for termination, and concluded Defendants "did not have any factual support to conclude the bases of termination set forth in the Final Notice merited finding the Provider Plaintiffs were not qualified" within the meaning of the Free-Choice-of-Provider requirement and that the termination decision was made "[w]ithout any evidence indicating an actual program violation warranting termination." ROA.3799, 3778, *see also*, *e.g.*, ROA.3800 ("no evidence"); 3809 (no prima facie evidence); 3813 ("[not] even a scintilla of evidence").[14]

---

[13] The district court cited to the prior version of the *Gee* opinion, which was withdrawn and replaced on June 29, 2017. *Gee*, 862 F.3d at 449. Citations here are to the latter version.

[14] The district court also held it would not consider reasons for termination that were not included in the Final Notice and not part of the Inspector General's final termination decision, as Defendants' belated attempt to rely on these additional bases violated both state and federal notice requirements. ROA 3798–99.

**A.    The CMP Video and PPGC's Supposed Violation of Medical and Ethical Standards**

The district court focused first on the CMP video,[15] which the Inspector General claimed demonstrated PPGC violated medical and ethical standards by demonstrating: (1) a "history of" altering and a "willingness" to alter abortions for research purposes; (2) that researchers at PPGC performed and possibly altered abortions to procure fetal tissue for their own research; and (3) a "willingness" to profit from procuring fetal tissue. ROA.3800, 4714–15. "After reviewing the CMP video in its entirety and considering the Inspector General's testimony," the district court held there was "*no* evidence in the record PPGC violated any medical or ethical standard." ROA.3800 (emphasis added).

---

[15] It is clear from the record that multiple versions of the video have been circulated, included heavily edited short versions that were released by CMP in 2016 on YouTube, as well as a longer but still incomplete version that was also distributed on YouTube. ROA.4161–62, 4235, 4949–50; 5529. The version referenced herein ("CMP video") is the version admitted at the hearing. The district court noted there was no evidence HHSC took any steps to verify the CMP video was not altered, or to authenticate it, and concluded that the "quality and strength of the evidence the CMP Video provides is suspect." ROA.3801. While Defendants now assert, Br. 49, that a forensic analysis they referenced in a brief (but which is not in evidence) included analysis of this version of the video, it is unclear what the basis is for that assertion. The district court nevertheless considered the CMP video to evaluate whether it provided evidence to support the terminations and, as set forth *infra*, concluded it did not. *Id.*

### 1.    Alteration of (or Willingness to Alter) Abortion Procedures for Research Purposes

The Inspector General admitted he had no evidence any PPGC doctor *ever* "altered the medical procedure of an abortion, for research purposes or for any reason." ROA.3801; *see also* 4376–77 ("Question: [Y]ou don't have any evidence of any abortion doctor that ever altered the abortion procedure in order to benefit research… Answer: [T]hat is right."). Rather, he claimed the CMP video showed PPGC's research director admitting PPGC doctors had altered abortion procedures, or were willing to do so. ROA.3802. However, the court found, even viewing these clips in the light most favorable to HHSC, they contained "nothing more than confused and ambiguous dialogue, open to interpretation," "exploring theoretical possibilities," and that "shift[ed] quickly between discussing changes to clinical processes necessary to incorporate research into a health center's operations and discussing changes to the medical procedures of an abortion." ROA.3801–02.

The court further found that the Research Director's role related primarily to family planning research and not abortion, ROA.3801, and that she "had no personal knowledge of the medical aspects of abortion procedures or PPGC's abortion procedures"—and indeed, had never been in the room when an abortion was

performed.[16]  ROA.3803.  The court held the Research Director indicated numerous

times on the video that if there was any request for a change to *medical* procedures

she would have to discuss it with the doctors, ROA.3803, and also that the site visit

featured on the video "is only a preliminary step in a research partnership; more

approval, from senior clinical staff and [Planned Parenthood's national office],

would be required before any research project could be undertaken," ROA.3804.

PPGC participated in two studies using pregnancy tissue since the Research

Director assumed that position in 2006 (the latter of which ended five years before

the video, in 2011).  In those studies, her role focused on the ways in which *clinic*

*operations* such as patient flow needed to be modified to accommodate research

needs.  ROA.3786, 3803.  And in both studies, the abortion-providing physician did

not know whether the patient had consented to donate tissue, ROA.3786, 3804–05—

and thus could not have altered the procedure to obtain usable tissue.[17]  Thus, the

court concluded, based on the video "it appears more likely [the Research Director]

---

[16] The court noted this lack of familiarity with abortion was clear from the video
itself, as the Research Director was unsure of such information as how gestational
age is determined or how second-trimester procedures differ.  ROA.3803.

[17] Defendants repeatedly make the sensational accusation that a University of Texas
Medical Branch ("UTMB") researcher would take tissue "home" in her cooler.  Br.
1, 14, 15, 34. The uncontroverted evidence in the record shows the researcher used
a cooler to transport tissue samples to her UTMB laboratory ROA.4190–91.
Defendants' attempt to suggest this physician hand-picked patients and asked staff
to try to enroll them, *see* Br. 52, is a similarly blatant distortion of the uncontroverted
testimony, which shows the researcher told staff only which gestational age ranges
were eligible for study participation. ROA.4191–92.

believed she was discussing changes to clinical operations rather than changes to the medical procedures of abortion," and that "the context of the CMP video eliminates the plausibility of interpreting it" to the contrary. ROA.3804. Moreover, while Appellants accuse PPGC of altering (or being willing to alter) abortion procedures in order to obtain intact specimens, the court credited the uncontroverted testimony of PPGC's medical director that "it is always clinically desirable to remove the fetus as intact as possible to minimize entries into the uterus." ROA.3882.

In contrast the Inspector General, "a lawyer with no medical training," relied on HHSC's Chief Medical Officer "to determine if the CMP Video included any medically unethical conduct. ROA.3803. However, the Chief Medical Officer—an "orthopedic surgeon who practices sports medicine"—candidly admitted he "would have to defer to an OB/GYN to evaluate abortion procedures," and that he would have only "the understanding of a lay person" as to discussions of such procedures in the CMP video. ROA.3803, 4398.[18] Therefore, the district court properly

---

[18] Defendants also put on testimony from Dr. Mikael Love, an ob/gyn with no research-related experience and who had not been consulted by Defendants prior to the termination. Dr. Love candidly acknowledged he had not seen any statements in the video indicating any PPGC physician had ever altered an abortion procedure or expressed intent to do so. He also acknowledged he did not know whether the Research Director was referring to the abortion procedure itself, or to other health center procedures, when she discussed alterations to facilitate research. ROA.4486, 4489–91.

concluded "the Inspector General had *no* evidence indicating PPGC ever altered an abortion procedure or would be willing to do so." *Id*. at 29 (emphasis added).

### 2. Performance of Abortions to Procure Tissue for their Own Research

The court then turned to the Inspector General's second basis for termination: that "the CMP video demonstrates researchers at PPGC performed abortions to procure fetal tissue, possibly altering procedures, for their own research," and found it "similarly unsupported by evidence."[19]  ROA.3804.  The court first noted that for the reasons already discussed, there was no evidence any PPGC doctor ever altered an abortion procedure or even knew whether an abortion patient had chosen to donate tissue to research.  ROA.3804–05.  The court also held there was no evidence it would violate medical or ethical standards to have an abortion provider also involved in research using pregnancy tissue, as the provisions the state relied on (45 CFR §46.204, 42 USC §289g-1(c)(4), and 42 USC §289g-1(b)(2)(C)(I)) did not appear to apply in the context of this research or, in the case of 45 CFR §46.204, to apply at all in the context of abortions.  ROA.3805; *see also* ROA.3631–32 ¶¶143–

---

[19] While Defendants now claim it violated ethical prohibitions for a physician providing abortions to also be involved in research using donated tissue, *see* Br. 34, the Final Notice did not include this claim; its only discussion of physicians procuring tissue for their own research is that the video reflected "a history of permitting staff physicians *to alter procedures* to obtain targeted tissue samples" needed for such research.  ROA.4715 (emphasis added).  As discussed *infra* at Argument II(B)(2), inadequate notice precludes this basis for termination.

148. And finally, the two studies PPGC participated in (the latter of which ended five years before the termination) were both approved by Institutional Review Boards ("IRBs") whose role was to "validate[] the studies' plans for managing legal and ethical issues," and there was no evidence this IRB approval was insufficient. ROA.3806. Thus, the court concluded, "the Inspector General had little to no evidence a doctor who performed abortion procedures and subsequently conducted research on the tissue collected violated medical or ethical standards." *Id.*

### 3.     Willingness to Profit from Fetal Tissue

Finally, turning to the Inspector General's claim that the CMP video reflected a "willingness" to profit from procuring fetal tissue, the court noted there was no evidence PPGC ever actually made a profit from facilitating tissue donation. To the contrary, "the Inspector General could not point to a single payment PPGC ever received that exceeded its expenses incurred." *Id.*[20] Not only did the videos—which recorded a "preliminary" discussion, ROA. 3804—not show any *attempt* to profit, but the court found there were simply no statements on the video that demonstrated such "willingness." ROA.3806.

---

[20] Indeed, the court found that for the most recent study (which involved first-trimester placental tissue, was conducted by UTMB, and concluded in 2011) PPGC was reimbursed under $10,000, which did not fully cover the administrative and staff-time expenses directly attributable to the study. ROA.3787.

Thus, the court found, for this accusation also "there is *no* factual support in the record for the conclusion PPGC violated medical and ethical standards or would be willing to do so. ROA.3807 (emphasis added).

### B. Claimed Evidence of PPGC Misrepresentation

Turning to the Final Notice's assertion the Inspector General had evidence the Provider Plaintiffs "engaged in misrepresentations about your activity related to fetal tissue procurements, as revealed by evidence provided by the [Select Panel]," ROA.4716, the sole claimed misrepresentation was that a PPGC staff member told a Texas Ranger (who was part of the investigation that exonerated PPGC, *see* Statement of the Case II(A)(2)(a), *supra*) that the IRB had not yet approved a proposed research project between Baylor and PPGC. ROA.3808–09. The Inspector General testified he relied on the Blackburn Letter (*see* Statement of the Case II(A)(2)(a), *supra*), which included an email chain between the Research Director and the Baylor researcher bearing the subject line "IRB approval obtained" and the Texas Ranger report containing the line "[t]he [IRB] has not yet given approval for the Baylor [study]." ROA.3808. The court found the Inspector General "conducted no additional interviews or investigations," but rather concluded from these two documents that a misrepresentation had been made that supported terminating Provider Plaintiffs from the Medicaid program. *Id.*

However, the Inspector General testified candidly at that he "did not know whether the statement…was a mistake or misrepresentation," and the court found he accordingly had "no evidence of whether the statement's speaker had the required intent to deceive." [21] *Id.*; *see also* ROA.4359 ("Q: Did anybody investigate the state of mind of that speaker that made that statement?  A: No.  Q: Do you have any idea whether she knew or didn't know that was wrong?  A: I don't.  Q: Okay.  So you don't know whether it's a mistake or a misrepresentation.  A: That's right.").

## C.    Claimed Evidence of "Affiliation"

Finally, with respect to the claimed evidence of "affiliation" (the *only* basis for terminating PPST and PPGT), the district court held that the Provider Plaintiffs "are separate entities, with no evidence of an ownership or control interest." ROA.3812.   It concluded, therefore, that termination on this basis would likely violate the Doe Plaintiffs' Free-Choice-of-Provider rights under *Gee*.   ROA.3810 (*citing Gee*, 862 F.3d 461–464).

* * *

---

[21] The court also held it was "unconvinced the Inspector General had any evidence [the claimed misrepresentation] … was material to a criminal investigation," as would be required to violate the state law provision on which Defendants rely. ROA.3808 n.8; *see* Tex. Penal Code §37.08(a); ROA.4716.

Finally, the district court found, based on the evidence of harm outlined above, that Plaintiffs satisfied the remaining preliminary injunction factors. ROA.3814–16. This appeal followed.

## SUMMARY OF ARGUMENT

This Court has already spoken on the issues presented in case in its recent decision in *Gee*, roundly rejecting Louisiana's attempt to terminate one of the *same* providers, PPGC, from its Medicaid program based on the *same* CMP video at issue here, and upholding the grant of a preliminary injunction preventing that termination from taking effect on a case that is procedurally, legally, and factually on all fours with this one.  In so doing, this Court resolved beyond all doubt that the Doe Plaintiffs have a private right of action under §1396a(a)(23) enforceable under §1983, which protects their right to choose from any provider who is "qualified" in the sense of able to "perform[] the needed medical services in a professionally competent, safe, legal, and ethical manner." *Gee,* 862 F.3d at 462.  It also made clear the state cannot simply "paste the labels" of wrongdoing on Plaintiffs' conduct "and then insist[] that … these content-less labels somehow insulate its termination actions from any §1396a(a)(23) challenge," *Gee*, 862 F.3d at 469; rather, where such accusations are "devoid of any factual support or linkage"—as the district court correctly found they are here—a provider cannot be terminated from Medicaid without violating the Doe Plaintiffs' Free-Choice-of-Provider rights.

Faced with this clear and binding precedent and the district court's detailed, well-supported findings that there was simply no basis to terminate PPGC from the Medicaid program (much less PPST and PPGT, who are accused of no "wrongdoing" other than affiliation with PPGC), Defendants disregard the district court's findings entirely and attempt a number of specious arguments for why the terminations should be allowed to stand. But none of these arguments explain why the outcome of this case should be different than *Gee*. Indeed, this Court has already rejected many of Defendants' arguments, including that the Doe Plaintiffs' Free-Choice-of-Provider rights may be curtailed because Provider Plaintiffs did not to exercise their option of an administrative appeal and that these rights extend only to the choice of providers the state has deemed qualified. Defendants' suggestion that the applicable standard of review is arbitrary and capricious is similarly contradicted by *Gee*'s analysis. And finally, Defendants do not even attempt to defend their position that the separate entities PPST and PPGT, which do not share any relationship of control or ownership with PPGC, may nevertheless be terminated from the Medicaid program based on PPGC's supposed misconduct.

Thus, for the same reasons as in *Gee*, and as detailed in the district court's findings, the district court did not abuse its discretion in concluding the Doe Plaintiffs likely to prevail on the merits of their Free-Choice-of-Provider claim.

# ARGUMENT

## I.     Standard of Review

Review of a district court's preliminary injunction is deferential and is limited

to whether the district court abused its discretion. *Byrum v. Landreth*, 566 F.3d 442,

445 (5th Cir. 2009). The district court's factual findings are "subject to a clearly-

erroneous standard of review." *Janvey v. Alguire*, 647 F.3d 585, 592 (5th Cir. 2011)

(internal quotation marks omitted). Under this standard, a factual finding will not be

disrupted if it is "plausible in light of the record viewed in its entirety," even if the

court of appeals "would have weighed the evidence differently" had it been sitting

as trier of fact. *Brumfield v. Cain*, 808 F.3d 1041, 1057 (5th Cir. 2015) (internal

quotation marks omitted).

## II.    The District Court Did Not Abuse its Discretion in Concluding Plaintiffs Likely to Succeed on the Merits

### A.     The District Court Correctly Held Doe Plaintiffs Have a Private Right of Action that Encompasses the Right to Choose a Provider the State Wrongly Deems Unqualified

As the district court correctly recognized, this Court has already spoken

authoritatively to the question of whether the Free-Choice-of-Provider requirement

gives rise to a private right of action under §1983 and concluded (like the Sixth,

Seventh, and Ninth Circuits, *see* Statement of the Case IV, *supra*) that it does. *Gee*,

862 F.3d at 457 ("[W]e conclude that §1396a(a)(23) affords the Individual Plaintiffs

a private right of action under §1983."); ROA.3796. The Court further recognized

this requirement guarantees Medicaid beneficiaries such as Doe Plaintiffs the right to choose any "qualified" provider "without governmental interference." *Gee*, 862 F.3d at 461, quoting *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 785 (1980). Thus, the requirement permits states to exclude a willing provider from Medicaid only "for reasons bearing on that provider's general qualification to provide medical services," *id.* at 465, meaning its ability to "perform[] the needed medical services in a professionally competent, safe, legal, and ethical manner." *Id.* at 462; *Betlach*, 727 F.3d at 969; *Comm'r of Ind.*, 699 F.3d at 968. In so holding, this Court rejected Louisiana's argument that the requirement affords only the right to choose from among providers the state has deemed qualified, as "[o]therwise, any right to which the Individual Plaintiffs are entitled to under §1396a(a)(23) would be hollow." *Gee*, 862 F.3d at 462.

The Court then turned its attention to the bases for termination Louisiana relied on (each of which it claimed violated applicable law supporting the sanction of termination): two pending qui tam FCA claims;[22] misrepresentations it claimed PPGC made in responding to Louisiana state inquiries about fetal tissue donation in response to the CMP videos; and two pending investigations of PPGC in response to the CMP videos. *Id.* at 465. This Court concluded none of these claimed

---

[22] These are the same claims Texas also initially relied on as bases for termination and then abandoned, *see supra* n.10.

violations are "directed at PPGC's qualification to render medical services to Medicaid patients," *id*, because none is factually or legally supported; "[a]t the most, [the Louisiana Medicaid agency] has simply pasted the labels of 'fraud' and misrepresentations' on PPGC's conduct, and then insisted that alone these contentless labels somehow insulate its termination actions from any §1396a(a)(23) challenges." *Id*. at 496. The Court concluded such "accusation[s]," "devoid of any factual support or linkage," cannot support a termination from the Medicaid program and cannot "insulate the [State's] actions from a §1396a(a)(23) challenge." *Id*. at 469–70. Indeed, "[i]f it were otherwise, states could terminate Medicaid providers with impunity and avoid §1396a(a)(23)'s mandate altogether." *Id*.

Mystifyingly, Defendants attempt to evade this clear authority by contending that "unlike in *Gee* … the Individual Plaintiffs are challenging the substantive merits of the state agency's finding that the Provider Plaintiffs are not 'qualified' providers under the Medicaid Act." Br. 17. But the plaintiffs in *Gee* challenged exactly that––the state's attempt to terminate their chosen provider from the Louisiana Medicaid program because (the state claimed) it had violated applicable law and thus was no longer a qualified Medicaid provider.

To the degree Defendants attempt to suggest *Gee* is distinguishable because there is some difference in kind between Louisiana's proffered bases for termination and Texas's, that distinction fails. *Gee* makes clear that had Louisiana's bases for

33

termination been legally and factually supported, and not called into question by the

politicized circumstances of the case, they might survive the Does' Free-Choice-of-

Provider challenge:

> To be sure, the general grounds for termination invoked by [Louisiana]—fraud, misrepresentation, and investigations—might well relate to a provider's qualifications. States undoubtedly must be able to terminate provider agreements in cases of criminal activity, fraud and abuse, and other instances of malfeasance.

*Gee*, 862 F.3d at 469.   However, this Court concluded these accusations were

"devoid of any factual support linkage." *Id*. In other words, Louisiana's attempt to

terminate PPGC from Medicaid did not fail because its bases for termination, in the

abstract, did not relate to provider qualification—it failed because they were a

transparent, unsupported attempt to "paste[] the labels" of misconduct on PPGC,

"and then insist[] that alone these content-less labels somehow insulate its

termination actions from any §1396a(a)(23) challenges." *Id.* (citing *Betlach* and

*Indiana* as prohibiting "simply labeling any exclusionary rule as a 'qualification' to

evade the mandate of the free-choice-of-provider requirement.").

Defendants' contention that this case more closely resembles *O'Bannon* than

*Gee*, Br. 22–25, is equally unavailing.   *O'Bannon* held §1396a(a)(23) does not

confer a constitutionally cognizable property right requiring a hearing be provided

to residents of a nursing home that lost federal certification as a skilled nursing

facility.  447 U.S. at 784.  Because the plain meaning of §1396a(a)(23) does not give

Medicaid beneficiaries a right to care from an "unqualified" provider, it could not give rise to a property right that entitled them to a hearing regardless of whether they had a substantive basis for contesting the decertification. *Id.* at 785 (§1396a(a)(23) "does not confer a right on a recipient to enter an unqualified home and demand a hearing to certify it, nor does it confer a right on a recipient to continue receiving benefits for care in a home that has been decertified").[23]

Thus, this Court correctly explained that *O'Bannon* held only that the Due Process Clause does not afford a right to a hearing for every recipient losing a chosen provider. *Gee*, 862 F.3d at 460; *see also Bentley*, 141 F. Supp. 3d at 1218 n.7 ("*O'Bannon* held that a Medicaid recipient has no due-process right to a hearing…not…that any time a State terminates a Medicaid provider…that decision is insulated from substantive review at the behest of recipients."). And this Court made clear *O'Bannon* is "inapposite," *Gee*, 862 F.3d at 460, to a situation where—as here—the Doe Plaintiffs contend the Provider Plaintiffs are "qualified" providers whose terminations violate the Does' substantive rights under §1396a(a)(23), and

---

[23] Indeed, in *O'Bannon* it appears the home's residents did not seriously contest that the home had committed violations that could authorize termination. Rather, the thrust of their complaint was that they were denied the opportunity to establish that moving to a new facility would be traumatic, as well as to provide their perception of the home's services, for the state to consider in making its decision. *See Town Court Nursing Ctr. v. Beal*, 586 F.d 280, 292–93 (3d Cir. 1978) (Adams, J., concurring), *rev'd sub nom. O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773 (1980).

where the state has taken no action to prevent the provider at issue from providing medical services to anyone other than Medicaid patients. *See id.* at 461 ("This case is different [from *O'Bannon*]. Louisiana has never complained that PPGC is not competent to render the relevant medical services, and it has taken no independent action to limit or terminate PPGC's entitlement to render medical services to the general population, for example, by revoking its license."); *see also id.* at 470 (allowing termination "would produce precisely the anomalous result that the free-choice-of-provider provision is meant to avoid, *viz*, [Louisiana] would deny PPGC's services only to Medicaid recipients while leaving all other individuals free to obtain the very same services from PPGC"); *id.* at 465.[24]

Finally, while Defendants emphasize that *Gee*'s holding was a "narrow" one, Br. 24, almost all the circumstances this Court highlighted as unusual in *Gee* apply here: like Louisiana, Texas has pursued a single-minded campaign to terminate the Provider Plaintiffs from Medicaid but taken no action to limit their ability to provide medical services to non-Medicaid patients, *Gee*, 862 F3d at 470; engaged in

---

[24] Defendants' argument that this case is distinguishable from *Gee* because OIG does not regulate individual physician licenses or license health centers, *see* Br. 26–27, fails. As this Court was surely aware the defendant in *Gee*, the Louisiana Department of Health and Hospitals, also had no regulatory authority over physician licenses; such authority rests solely with the Louisiana State Medical Board of Examiners. *See* La. Stat. Ann. § 37:1270. Moreover, HHSC oversees the Department of State Health Services, which is responsible for licensing health centers in Texas. *See* 25 Tex. Admin. Code § 139.1.

"gamesmanship" and "run circles around [Provider Plaintiffs] and the district court," *id.* at 469, with shifting and post-hoc justifications for termination decisions that were accompanied by public statements that the terminations are motivated by animus against abortion and/or Planned Parenthood, *id.* at 468–69, and relied on bases for termination that are both factually and legally unsupported, *id.* at 469. And just as in *Gee*, at issue is a "pre-merits, status quo" preliminary injunction, which has allowed "some of the state's neediest citizens to continue receiving care from a medically qualified provider," preventing "the clinics' poorest patients" from suffering "permanent harm" during the litigation. *Id* at 450, 472.

In short, there is simply no daylight between this case and *Gee* in terms of the availability of a private right of action to enforce the Doe Plaintiffs' Free-Choice-of-Provider rights, or the applicability of those rights to the state's attempt to terminate the Does' chosen providers from the Medicaid program, and Defendants' attempts to suggest otherwise fail.

## B.     The District Court Properly Held that the Terminations Violates the Doe Plaintiffs' Right to Free Choice of Provider

The district court also properly ruled that the Doe Plaintiffs are likely to succeed on their claim Defendants' baseless termination violates their rights under §1396a(a)(23), because every alleged ground for termination is clearly invalid.

### 1.    Allegations Against PPGC in HHSC's Final Notice Are Baseless

As set forth *supra* in Statement of the Case V, the district court made detailed findings examining the evidence Defendants relied on in making the termination decision reflected in their Final Notices, which claimed (a) "a 'history of' altering and a 'willingness' to alter abortions for research purposes;" (b) that "researchers at PPGC performed and possibly altered abortions to procure fetal tissue for their own research;" (c) a "'willingness' to profit from procuring fetal tissue," and (d) that PPGC "engaged in misrepresentations about [its] activities related to fetal tissue procurements," ROA.3800, 3807.  As the court summarized in concluding there was not "a scintilla of evidence," ROA.3813, to support any of these accusations:

> [T]o summarize, the Inspector General relied on an unauthenticated video and the advice of an orthopedic surgeon to conclude PPGC violated medical and ethical standards related to abortion procedures. The video… offers, at most, theoretical conversations concerning what might be a possible research partnership.... The Inspector General had no evidence any PPGC doctor ever altered an abortion procedure, for research or for any other purpose.  The Inspector General also possessed no evidence any researcher ever knowingly performed or altered an abortion to procure fetal tissue for his or her research.  And even if a doctor did collect fetal tissue for her own research after performing an abortion, the Inspector General had no evidence such activity violates medical and ethical standards.  Lastly, the Inspector General possessed no evidence PPGC ever profited, or even sought to profit, from procuring fetal tissue.

ROA.3807.  The court similarly found that "the Inspector General concluded PPGC made a misrepresentation following the identification of a single allegedly incorrect statement, without any evidence the statement was a misrepresentation rather than a

mistake," and that "the evidence in the record implies HHSC was motivated by reasons other than qualifications to terminate the Provider Plaintiffs from Medicaid." ROA.3814.

Turning first to alteration of the abortion procedure, Defendants' response to the district court's detailed findings consists primarily of bulleted quotations from the CMP video they contend reflect a history of altering, or a willingness to alter, abortion procedures to obtain usable tissue for research. *See* Br. 14–15, 35–38. But these quotes are entirely consistent with the court's finding, after consideration of the video as a whole, that they had to do with altering *clinic processes*, not the medical abortion procedures, and that there was *no* evidence either that any procedure was ever altered, or of willingness to do so. *See supra* Statement of the Case V(A)(1); *see also* ROA.3608–3616 ¶¶75–90 (discussing the quotations in their video context). Defendants also ignore the significant concessions their own witnesses made in discussing the videos, including that the Inspector General admitted he had no evidence any PPGC doctor ever altered an abortion procedure; that he also admitted he relied on HHSC's Chief Medical Officer (a sports medicine doctor) to determine if the CMP video reflected any unethical conduct; and that the Chief Medical Officer in turn admitted he had only "the understanding of a lay person" as to the discussions of abortion procedures in the video. *See supra* Statement of the Case V(A)(1).

Turning next to the accusation it violated ethical restrictions for a physician involved in a study using first-trimester placental tissue to also perform abortions—an accusation not even contained in the Final Notice, *see supra* n.10—the provisions on which Defendants rely actually advise that individuals engaged in research should "ha[ve] had no part in any decisions as to the timing, method, or procedures used to terminate the pregnancy." 42 U.S.C. §289g-1(c)(4); 45 C.F.R. §46.204(i).  But there is no conceivable possibility (let alone evidence) that a PPGC physician could ever have played a role in any such decisions, given that (1) the study at issue used only first-trimester tissue, which can only be removed in one way, *see* ROA.4245, 5044, 3216, and (2) as the district court found and the uncontroverted evidence showed, the abortion-providing physician never knew whether a patient had elected to donate tissue.  ROA.3804–05.  Moreover, the study design (including the fact a physician providing the abortion would be an investigator) was approved by the UTMB IRB made up of independent physicians, ethicists, and scientists, and as the district court held, there is no showing that approval was inadequate.  ROA.3806; *see also* ROA.4165–66, 4168.

As to the allegation of "willingness" to profit, again, the quotes on which Defendants rely, *see* Br. 38–39, are entirely consistent with the court's finding there was no evidence of such willingness and certainly no actual history of profiting from facilitating tissue donation. In fact, some of the quotations make clear the Research

Director was careful to restrict reimbursement to allowable expenses. *See, e.g.*, Br. 39 ("I'm very particular about working with the language of the budget…to where the language is specific to covering the administrative costs.").

And finally, as for the claim of false statement to law enforcement, it verges on absurd that Defendants continue to advance this as a basis for termination when the Inspector General (who made the termination decision) testified he did not have any idea whether it was a mistake or a misrepresentation. *See* ROA.3808; 4359.

### 2. Defendants' Post-Hoc Justifications for Termination Cannot Succeed

Perhaps in an effort to evade the District Court's strong findings, Defendants also rely on a number of post-hoc justifications, *see e.g.* Br. 43–45, 53–54, but as the district court recognized, justifications not included in the Final Notice cannot support a Medicaid termination. ROA 3798–99; *see also* 42 U.S.C. §1320a-7 (requiring "reasonable notice" before termination); 1 Tex. Admin Code §371.1703(f) (provider must be given notice of termination as part of due process); *Id.* §371.1703(e) (notice of termination must include "the basis for the termination"); *see also Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970); *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976). For this reason alone, these after-the-fact rationales for termination cannot support Provider Plaintiffs' termination from Medicaid—and indeed, only underscore the political and results-driven nature of Defendants' efforts to identify *any* rationale to support their desired outcome. This Court has already

rejected this terminate-first, justify-later approach, holding that Louisiana's "strategy to terminate PPGC's provider agreements before it can even identify a single misrepresentation does not pass muster." *Gee*, 862 F.3d at 468.

Regardless, these belated justifications are also factually unsupported. For example, Defendants attempt to suggest PPGC used forms that were inadequate to provide informed consent. Br. 43–45. But Defendants' complaint appears to be about a form PPGC never actually used, because it was not implemented until after the conclusion of the UTMB study (the last study using pregnancy tissue for which PPGC facilitated tissue donation). ROA.8866, 4194–97, 4233; *see also* ROA.4196–97 (Research Director testifying PPGC's form did not use the language Defendants claim is misleading); ROA.3633–34 ¶¶150-152 (detailing why form was not misleading).

Defendants' attempt to suggest the Provider Plaintiffs "made misleading statements about issues germane to this action," Br. 53–54, is equally unavailing. For example, they claim Plaintiffs made misrepresentations in demanding a copy of the supposedly unedited version of the CMP video on which Defendants relied in their Final Notice (which they refused to provide until shortly before the hearing), when PPGC had obtained a copy of a video from the Harris County District Attorney's Office. But this accusation ignores that multiple versions of the video were in circulation, *see* n.15, *supra*, and Plaintiffs were entitled to the opportunity

to review the video on which HHSC relied—not to be forced to speculate about whether it contained the same or different footage as any of the multiple versions they had seen. Defendants' claim that PPGC provided misleading statements in the *Gee* litigation are equally unfounded, as the uncontroverted evidence shows that PPGC's last facilitation of tissue donation was in 2011. Finally, Defendants claim PPFA (who is not a party to this case and does not provide healthcare to patients in Texas or elsewhere) misrepresented the number of Planned Parenthood affiliates that facilitated donation of fetal tissue between 2010–2015 by not including PPGC in that number, when the UTMB study extended into that period. But the UTMB research involved first trimester placental tissue, not fetal tissue (though PPGC nevertheless followed the protocols that would apply for facilitation of fetal tissue donation). ROA.5527, 4165, 4171–73, 4242.

### 3. Even if True, Defendants' Allegations Would Not Provide a Valid Basis to Terminate PPGT and PPST

With respect to PPGT and PPST, Defendants' actions are unlawful for an additional reason: they are based solely on allegations against PPGC. As detailed at Statement of the Case V(A)(2)(c), the district court correctly found and the uncontroverted evidence shows that PPGT, PPST, and PPGC are wholly separate Planned Parenthood organizations, with no overlap in ownership, control, operations, or finance. Indeed, the Inspector General conceded there is no

relationship of ownership or control among them.  ROA.4351. Nor are their operations controlled by PPFA.  ROA.4113.

Remarkably, Defendants do not even address the District Court's conclusion that the claimed misconduct by PPGC (even if true) would be an insufficient basis on which to terminate the wholly separate PPST and PPGT.  Accordingly, they have waived any argument on this point.  *Doe v. Columbia-Brazoria Indep. Sch. Dist. by & through Bd. of Trustees*, 855 F.3d 681, 688 (5th Cir. 2017) (argument forfeited where appellant "failed to analyze the theory in a meaningful way in his opening brief"); *Castorena v. Zamora*, 684 F. App'x 360, 365 (5th Cir. 2017) ("Issues submitted to this Court that are inadequately briefed are considered abandoned.").

Nonetheless, as the district court correctly recognized, ROA.3809–12, federal law is clear that a provider cannot be excluded from Medicaid based on mere sharing of the name "Planned Parenthood" and membership in PPFA.  The text of 42 U.S.C. § 1320a-7(b)(6)(B) allows for termination of "*any individual or entity* that the Secretary determines . . . has furnished or caused to be furnished items or services to patients . . . of a quality which fails to meet professionally recognized standards of health care" (emphasis added).  Similarly, 42 U.S.C. § 1396a(p)(1) allows a state to terminate "*any individual or entity* . . . for any reason for which the Secretary could exclude the individual or entity" (emphasis added).  By the plain language of these provisions, the entity being terminated must be the same entity that furnished

or caused to be furnished the services at issue.  *See Bentley*, 141 F. Supp. 3d at 1223 (federal law "does not permit this"); *see also* 42 U.S.C. §1320a-7(b)(8) (allowing discretionary exclusion of "[e]ntities controlled by a sanctioned individual" in the sense that that individual "has a direct or indirect ownership or control interest," or "is an officer, director, agent, or managing employee" of the entity).[25]

Nor can the Texas regulations on which Defendants' Final Notices rely sustain the termination. These provisions, which were written into Texas law by HHSC during the same period it was trying to exclude Planned Parenthood from other federally funded programs, state that OIG may terminate the Medicaid provider agreement of a person when it "establishes ... by prima facie evidence" that the person is "affiliated with a person who commits a program violation," 1 Tex. Admin. Code §371.1703(c)(7), and defines "affiliate" as (among other factors) a person who "shares any identifying information with a person, including . . . corporate or franchise name." *Id.*  §371.1(3)(I).   HHSC also relies on a general provision that states that "[a] Medicaid . . . provider is responsible for . . . the actions and omissions of the provider's affiliates, employees, contractors, vendors, and agents." *Id.* § 371.1605(a)(2).  This sweeping new ground for excluding providers, which appears

---

[25] Congress and HHS were very specific about the types of ownership and control interests that support termination under 42 U.S.C. §1320a-7(b)(8), none of which could remotely apply here. *See* 42 U.S.C. §1320a-7(b)(8)(A)(i)–(iii); 42 C.F.R. §1001.1001(a).

to have never been applied by HHSC until now, cannot support PPGT's and PPST's

termination because it is squarely at odds with both the federal provisions governing

when an entity may be terminated for sanctionable  conduct by a related entity and

the Free-Choice-of-Provider requirement. *See Gee*, 837 F.3d at 494 ("[i]f states are

free to set any qualifications they want—no matter how unrelated to the provider's

fitness to treat Medicaid patients—then the free-choice-of-provider requirement

could be easily undermined by simply labeling any exclusionary rule as a

qualification." (*quoting Comm'r of Ind.*, 699 F.3d at 978); *see also Betlach*, 727 F.3d

at 971. The undisputed evidence is that PPGT and PPST did nothing "wrong" other

than use the same trademark as PPGC, and that cannot be a sufficient ground to deem

wholly separate providers who have provided excellent care in the Medicaid

program for decades "unqualified."

### 4.    Arbitrary and Capricious Review Does Not Apply and, If It Does Apply, Is Met

Defendants' novel argument that the applicable standard of review is arbitrary

and capricious finds no support in the case law interpreting the Free-Choice-of-

Provider requirement.  To begin with, Defendants fundamentally misconstrue the

nature of Doe Plaintiffs' Free-Choice-of-Provider claim; it is not an appeal of an

agency determination, but rather a statutory claim under the Medicaid Act giving

rise to a right of action in federal court under §1983.  Defendants point to no case

law imposing arbitrary-and-capricious review on such a claim.  And indeed,

Defendants' argument that the court should be bound by agency findings makes little sense given that the Free-Choice-of-Provider requirement belongs to Medicaid beneficiaries such as the Doe Plaintiffs—not to Medicaid providers—and these patients have no administrative remedy and no role in building an administrative record. *Gee*, 862 F.3d at 455.[26]  Defendants' argument is nothing more than a backdoor attempt to restrict the Doe Plaintiffs' challenge because the Provider Plaintiffs did not elect an administrative appeal.  But this Court has already rejected this argument, holding that because the Doe Plaintiffs have no administrative rights, "they are not subject to (nor could they be) any administrative exhaustion requirement under 42 U.S.C. §1983." *Id.*

Moreover, *Gee*'s analysis is wholly incompatible with arbitrary and capricious review, since this Court scrutinized each of Louisiana's three purported grounds for PPGC's termination and considered  the parties' record evidence in concluding that the termination was impermissible.  *See id.* at 467 ("the undisputed evidence establishes that PPGC does not perform any abortions or operate any fetal tissue donation"); *id.* at 468 ("The district court found that the undisputed evidence revealed no indication that PPGC had made any misrepresentations ... "); *see also*

---

[26] For these reasons, Defendants' argument the district court was limited only to the evidence that was before HHSC at the time it made its decision is misplaced. Br. 41. This argument is simply another attempt to import an exhaustion requirement the law does not support.

*id.* at 466–67 (rejecting allegation of fraud based on qui tam cases settled without admitting liability).

Defendants rely exclusively on *Abbeville*, which involved the rate-setting requirements of the Boren Amendment, §1396a(a)(13)(A)—not the Free-Choice-of-Provider requirement.  Rate-setting is a highly discretionary exercise in which states "adopt rates that are actually reasonable and adequate." *Abbeville Gen. Hosp. v. Ramsey*, 3 F.3d 797, 802 (5th Cir. 1993). This case, conversely, involves the "simple factual question" whether "the provider is 'qualified to perform service or services required.'" *Gee*, 862 F.3d at 459 (quoting *Betlach*, 727 F.3d at 967).   And unlike Boren Amendment challenges, which involve the "balancing of policy and financial considerations," *Abbeville*, 3 F.3d at 803 (5th Cir. 1993), whether a provider is "qualified to perform ... services required" is a question "free from 'any balancing of competing concerns or subjective policy judgments.'" *Gee*, 862 F.3d at 459 (quoting *Betlach*, 727 F.3d at 967).   At bottom, agency policymaking warrants deferential review because of the "federal agency's ... 'expertise and familiarity with subject matter of its mandate,'" as well as and specific to the Boren Amendment, "rate-setting flexibility." *Abbeville*, 3 F.3d at 803 (citation omitted).[27]  But here, this Court (as well as the Sixth, Seventh, and Ninth Circuits) has already concluded that

---

[27] *See Texas v. EPA*, 690 F.3d 670, 678 (5th Cir. 2012) (deference not required where agency did not rely on its technical expertise, and failed "not only to put forth evidence demonstrating interference, but also to put forth a cogent theory").

it is competent to resolve the qualification question, and indeed, that question is "no different from those courts decide every day." *Gee*, 862 F.3d at 459 (quoting *Betlach*, 727 F.3d at 967).

Even apart from the clear differences between rate-setting and the determination whether a provider is qualified, *Abbeville* makes clear that the arbitrary and capricious standard should apply only to findings that are bona fide, 3 F.3d at 804—*i.e.*, the agency must possess some "minimum quantum of evidence" to substantiate its findings. *Id.* at 805. Here, the district court did the same as the *Abbeville* court and reviewed the record for any actual evidence to support the terminations.  ROA.3798 (observing Texas law requires the Inspector General to "have evidence sufficient to establish the provider or its affiliate committed a program violation, *i.e.* a violation of state law, federal law, or Texas Medicaid policies" (citing 1 Tex. Admin. Code §371.1703(c)).[28] And after its review, the court correctly found that Defendants "did not have *any* factual support" for its finding that "the Plaintiff Providers were not qualified." ROA.3799 (emphasis added).

Even if arbitrary and capricious were the appropriate standard of review (which it is not), the district court clearly found that Defendants' termination

---

[28] This of course presumes HHSC made an actual "determin[ation]" that Provider Plaintiffs violated professional standards of health care delivery, as required by Tex. Admin. Code §1320a-7(b)(6)(B). A "mere willingness [to violate medical or ethical standards], without any evidence of attempt," is insufficient. ROA.3806 (citing *Gee*, 862 F.3d at 469).

violated this standard. Arbitrary-and-capricious review is not as toothless as Defendants suggest; rather, it requires "thorough, probing, in-depth review." *Abbeville*, 3 F.3d at 804 (citation omitted).  Deference, moreover, cannot fill in for the lack of evidence. *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 643 (1986); *see La. Envtl. Action Network v. EPA*, 382 F.3d 575, 582 (5th Cir. 2004) ("we may not defer to an agency decision that 'is without substantial basis in fact'" (citation omitted). Arbitrary-and-capricious review requires "careful[] review[]" and the court to "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). Here, the district court conducted a careful review and properly found that defendants "did not have *any* factual support" for its finding that "the Plaintiff Providers were not qualified." ROA.3799 (emphasis added).  Defendants' argument for a more deferential standard of review is nothing more than a slight variant on the same theme that *Gee* rejected: the state cannot "simply paste[] the labels of 'fraud' and 'misrepresentations' on PPGC's conduct, and then insist[] that alone these content-less labels somehow insulate its termination actions from any §1396a(a)(23) challenges." *Gee*, 862 F.3d at 469.[29]

---

[29] It bears repeating, moreover, that Defendants do not even bother to assert that the other Provider Plaintiffs, PPGT or PPST have committed any legal or ethical violations that would make them unqualified to provide Medicaid services.

### 5.     Defendant's Pennhurst Argument is Unavailing

Finally, Defendants' argument that *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981), permits them to interpret the Free-Choice-of-Provider requirement to allow termination of Medicaid participants based on "transgress[ion of] accepted medical or ethical standards," Br. 1, 27–30, is both confused and of little relevance.  In the context of determining that §1396a(a)(23) gives rise to a private right of action enforceable under §1983 this Court has already joined the Sixth, Seventh, and Ninth Circuits in holding that the meaning of "qualified" is clear and unambiguous.  *Gee*, 862 F.3d at 459 ("qualified" "suppli[ies] concrete and objective standards for enforcement which are well within judicial competence to apply") (internal quotation marks and citation omitted).  That is the clear statement required by *Pennhurst* and as this Court (as well as the Seventh and Ninth Circuits) have already held, Congress required that patients be free to choose from willing Medicaid providers who are "capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner."  *Gee*, 862 F.3d at 465.

Therefore, the question before the district court—which it answered properly—was *did* Provider Plaintiffs' termination from Medicaid relate to an inability to perform the needed medical services in a professionally competent, safe,

legal, and ethical manner.[30]  And the district court properly found that the answer to

that question was a resounding no.

## IV.  The District Court Did Not Clearly Err In Finding the Other Preliminary Injunction Requirements Are Met

### A.    The District Court's Finding that Doe Plaintiffs Would Be Irreparably Harmed Without an Injunction Is Not Clearly Erroneous

The district court's finding that Doe Plaintiffs (like Provider Plaintiffs' 11,000

other Medicaid patients) would be irreparably harmed if unable to receive Medicaid

services at Provider Plaintiffs is amply supported by the record. The court held that

absent an injunction Doe Plaintiffs would be denied access to their chosen family

planning provider, would "see their health care disrupted," and would be at risk of

being unable to find adequate other providers.  ROA.3815.  Implicit in these findings

is that if Provider Plaintiffs are terminated from the Medicaid program and could no

longer receive reimbursements for their services, they would be unable serve these

patients without payment.   And these findings are amply supported.  *See*, e.g.,

ROA.4298–99 (testimony of PPST CEO that he lacked funds to cover Medicaid

patients' care and these patients "would have to be charged like our other clients,"

which they cannot afford); *see also* ROA.4296–97 (about 1700 PPST patients will

---

[30] It is unclear what the difference is between this Court's requirement of providing care in an a "safe" and "ethical manner" and Texas' requirement to follow "accepted medical or ethical standards."  At any rate, it is amply clear that neither standard is met here.

be denied care); 1298–99, 1304 (same). The other Provider Plaintiffs' CEOs similarly testified that they would have to turn their Medicaid patients away. *See* ROA.4113–14 (after exclusion, Medicaid patients "wouldn't know where to turn"; ROA.1185–86, 1195 (over 4000 PPGT patients will be turned away and see a disruption in care). And Defendants also disregard evidence that termination would force Providers Plaintiffs to reduce hours and staff positions and potentially close health centers, at great detriment to the Doe Plaintiffs and other Medicaid patients. ROA.4114, 4133–34, 4302.

The record thus amply supports the District Court's finding that the termination will cause Doe Plaintiffs to be denied care at their provider of choice.

**B.     The District Court's Findings that the Balance of Equities and Public Interest Both Favor Plaintiffs Are Not Clearly Erroneous**

Defendants' argument that the public interest and the balance of equities favor Defendants rests on the falsehood that PPGC showed a "repeated willingness to engage in behavior that violates accepted medical and ethical standards." Br. 56. For reasons discussed above, and as the District Court found in rejecting this very argument, there was not a "scintilla of evidence" to support this conclusion. ROA.3813. Additionally, as *Gee* held, Defendants "can never have a legitimate interest in administering [the Medicaid] program in a manner that violates federal law," and, because the public interest is served by "safeguarding access to health

care for those eligible for Medicaid," *Gee*, 862 F.3d at 471–72, the preliminary injunction serves the public interest.

## V.    The District Court Did Not Commit Err in Preliminarily Enjoining Defendants From Terminating Provider Plaintiffs' Medicaid Provider Agreements

Defendants lastly contend the injunction should be limited to the Doe Plaintiffs. This argument ignores both *Gee* and other cases affirming injunctions that permitted the providers to remain in Medicaid while the case proceeded. *See Gee*, 862 F.3d at 473; *Comm'r of Ind.*, 699 F.3d 962; *Betlach*, 727 F.3d 960; *Mosier*, 2016 WL 3597457, at *26 ("class certification is unnecessary in order to award relief to all Kansas Medicaid patients who obtain or seek to obtain covered health services from [Planned Parenthood]"); *Bentley*, 141 F. Supp. 3d at 1229 (reinstating provider agreements such that provider plaintiffs may be reimbursed for any eligible patient's care); *see also Planned Parenthood Se., Inc. v. Dzielak*, No. 3:16CV454-DPJ-FKB, 2016 WL 6127980, at *1 (S.D. Miss. Oct. 20, 2016) (entering declaratory judgment invalidating Mississippi statute excluding abortion providers from Medicaid).

That is because an injunction covering Provider Plaintiffs' provider agreements in their entirety, and thus permitting Provider Plaintiffs to continue serving all Medicaid patients, is the only way to give meaningful relief to Doe Plaintiffs. Absent such relief, lost revenue will force Provider Plaintiffs to reduce hours and services, and potentially close clinics. *See* Statement of the Case III, *supra*.

This is also the appropriate remedy in light of the nature of the Medicaid program, in which any enrolled provider is reimbursed for covered services to *any* patient insured through Medicaid.  *See also Hernandez v. Reno*, 91 F.3d 776, 781 (5th Cir. 1996) ("Class-wide relief may be appropriate in an individual action if such is necessary to give the prevailing party the relief to which he or she is entitled.").

Finally, limiting the injunction to the provider agreements for the health centers where Defendants claim the Doe Plaintiffs have gone, ignores that they do not always obtain care at one health center and there is no legal reason to limit them to the health centers they have visited to date. *See, e.g.*, ROA.3781 (finding that Doe #1 has been to several of PPST's health centers).  It further misapprehends the right at stake: Doe Plaintiffs enjoy the right to the provider—not a health center location— of their choice.

## CONCLUSION

For the foregoing reasons, the order of the district court denying the motion to dismiss and entering a preliminary injunction should be affirmed.

Respectfully submitted,


/s/ Jennifer Sandman
Jennifer Sandman
Planned Parenthood Federation of America, Inc.
123 William Street
New York, NY 10038

(212) 541-7800
(212) 247-6811 (telefacsimile)
jennifer.sandman@ppfa.org

Richard Muniz
Planned Parenthood Federation of America,
  Inc.
1110 Vermont Avenue, NW, Suite 300
Washington, DC 20005
(202) 973-4800
richard.muniz@ppfa.org

Thomas H. Watkins
Texas Bar No. 20928000
Husch Blackwell, L.L.P.
111 Congress Avenue, Suite 1400
Austin, Texas 78701
(512) 472-5456
Tom.Watkins@huschblackwell.com


Attorneys for Plaintiffs-Appellees

October 6, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of October, 2017, I electronically filed the foregoing **Brief of Plaintiffs-Appellees** with the clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel for Defendant-Appellant and Amici Curiae.

*/s/ Jennifer Sandman*
Jennifer Sandman
Attorney for Plaintiffs-Appellees

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g) I hereby certify that:

1. The Brief of Plaintiffs-Appellees complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,943 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f).

2. This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in Microsoft Word for Mac 2011 with Times New Roman, 14 point font.

Dated: October 12, 2017

*/s/ Jennifer Sandman*
Jennifer Sandman
Attorney for Plaintiffs-Appellees